## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

JAMES McGREW,                          :

    Plaintiff,                     :
                                    Case No. 3:13cv00118

vs.                                    :

                                      District Judge Thomas M. Rose

CAROLYN W. COLVIN,                     :    Chief Magistrate Judge Sharon L. Ovington
Acting Commissioner of the Social
Security Administration,               :

    Defendant.                     :

## REPORT AND RECOMMENDATIONS[1]

### I.    <u>Introduction</u>

Plaintiff James McGrew, a veteran of the Gulf War Era who served in the Army from July 1992 to December 1999, sought financial assistance from the Social Security Administration by applying for Disability Insurance Benefits ("DIB") in September 2009, alleging disability since November 17, 2006.[2]  (*PageID## 238-47, 395*).  He claims disability due to degenerative disc disease, facet arthropathy, bulging discs, and post-traumatic stress disorder ("PTSD").  (*PageID## 300, 349*).

---

[1]Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

[2]At the administrative hearing, McGrew amended his onset date to April 21, 2008.  (*PageID## 94-95*).

After various administrative proceedings, Administrative Law Judge ("ALJ") Mary F. Withum denied McGrew's DIB application based on her conclusion that his impairments did not constitute a "disability" within the meaning of the Social Security Act. (*PageID##* 65-80). The ALJ's nondisability determination and the resulting denial of benefits later became the final decision of the Social Security Administration. Such final decisions are subject to judicial review, *see* 42 U.S.C. § 405(g), which McGrew is now due.

This case is before the Court upon McGrew's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #12), McGrew's Reply (Doc. # 13), the administrative record (Doc. #7), and the record as a whole.

## II. <u>Background</u>

### A. <u>McGrew's Vocational Profile and Testimony</u>

McGrew was 42 years old on his date last insured and is thus considered to be a "younger individual" for purposes of resolving his DIB claim. *See* 20 C.F.R. § 404.1563(c); *see also PageID##* 79, 295. McGrew has a high school education and two years of college. (*PageID##* 79, 306). During his Army service, he was a truck driver and was exposed to combat in Somalia from September 1993 to January 1994. (*Id.*). McGrew's primary employment after his military service was as a heavy/oil truck driver and mail carrier. (*PageID##* 78, 301, 308).

McGrew testified he stopped working in November 2006, "[b]ecause of a back injury, and the Post Office medical'd me out." (*PageID#* 98). McGrew "very rarely"

2

drives and stays at home a lot.  (*PageID#* 99).  He lives with his wife and four children.

(*PageID#* 99-100).  When asked what limits his ability to do things, McGrew replied,

"[m]y back.  I have days where I don't want to leave the house.  I went through a spell of

that.  I went from pretty much being laid up on the couch to now I'm forcing myself to --

I'm just happy to wake up in the morning, and, you know, depression, and I used to think

it was a joke.  I used to laugh about it, but now I know it can almost take you out.  So

physically and mentally, it's just an everyday struggle."  (*PageID#* 103).

McGrew testified he wears a back brace at home and has received over thirty-six

(36) injections to help with the pain.  (*PageID##* 107, 120).  He stated that he is on a

"wait and see what happens" basis regarding his back pain.  If the injections do not keep

the nerve endings numb, "the next step is to permanently kill the nerve endings."

(*PageID#* 106).  As to his mental impairments, McGrew testified he takes medication for

his PTSD, depression, and bipolar disorder.  (*PageID#* 108).  He stated he has been

treating with the "head shrink at the VA," Dr. Sehbi, for a few years, and also meets with

"the suicide prevention lady, Fran."  (*PageID##* 108-09).  He has been seeing Dr. Sehbi

for about an hour, "sometimes longer," approximately every four to six weeks, or "sooner

if [he] need[s] to go in."  (*PageID#* 110).

During a typical day, McGrew testified he wakes up around 6 or 7 in the morning,

does some stretching his chiropractor taught him,[3] drinks some tea, and then might do

---

[3] The stretching consists of laying on his stomach and pushing back.  (*PageID#* 118).  He is
unable to do stretches requiring bending at the waist or knees.  (*PageID#* 117).

3

some crossword puzzles.  (*PageID#* 111).  He testified he never used to do crosswords, but he is unable to sit at the computer and "hardly ever" watches television.  He stated, "[t]he VA suicide [prevention] lady said, you know, try to get more in touch with your family.  I've – that's pretty much what I've been doing. . . ."  (*PageID#* 113).  His first meal is lunch, when he usually just eats a sandwich his wife makes and leaves for him.  (*Id.*).  He testified he sometimes needs help with getting dressed and showering, "depending on how bad the day is."  (*PageID#* 112).  He stated his kids, even the youngest (a 7-year old), all have assigned chores and "really take care of me."  (*PageID##* 113-14).

He testified he does not like crowds[4] and he has "a really hard time living . . . close to the Air Force base with the planes that fly above the house, because I watched a lot of them get shot at.  That's why I don't really go – I used to hang outside; I don't go outside.  I have constant flashbacks. . . ."  (*PageID##* 114-15).  McGrew also testified he is often angered and stressed without his medication.  He stated he told his psychiatrist that "if I don't take my medication, anything is possible."  (*PageID#* 116).  Even when he does take his medication, however, he testified he "might be good for a while, but it doesn't totally control [his conditions].  And, you know, my wife, I mean we've fortunately been able to really communicate, and she's really been nice and comforting, and being patient as far as when she comes home and sees a certain look on my face, nobody goes around

---

[4] He stated a "crowd" is about six people.  (*PageID#* 115).

4

me.  And I hate that . . . ."  (*PageID#* 116).  He stated "I have everything to be happy for, wife and kids, and I can't be happy."  (*Id.*).

McGrew takes medication every night in order to sleep but "wake[s] up in panic" because he does not know "what . . . went on all night."  McGrew also testified his back pain is constant, "every day."  (*PageID#* 119).  He found the most comfortable position is for him to be lying on his back with his knees up.  (*PageID#* 120).  He testified he keeps ice on his back "all day long."  (*Id.*).

McGrew also testified he has problems using his hands because he had Methicillin-resistant Staphylococcus aureus ("MRSA") in his right hand, and "almost lost [it]."  (*PageID#* 118).  Although the infection has apparently "been downgraded to staph . . . [he is] still in the battle – still battling it."  (*Id.*).  McGrew sees a dermatologist once every four weeks regarding abscesses he has had growing on his arms, back, torso, and upper legs, related to the infection.  (*PageID##* 121-22).  He stated that when he has these lesions, they are extremely painful and worsened by clothing rubbing on them.  (*PageID#* 122).  He also stated he has been on either antibiotics or probiotics since the MRSA infection originated in 2008.  (*Id.*).

### B.  Vocational Expert Testimony

A Vocational Expert ("VE") testified at the hearing regarding McGrew's past employment.  The VE classified McGrew's work as a heavy truck driver, mail carrier, and tank truck driver, as semi-skilled positions, and, based on McGrew's testimony, all performed at the heavy exertional level.   (*PageID##* 124-25).

Based on McGrew's age, education, work experience and residual functional capacity ("RFC"), the VE testified that a hypothetical worker could not perform his past relevant work, but could perform 40,000 medium jobs in the regional economy (such as an order filler, hand packager, or store laborer) and 35,000 light exertional jobs in the regional economy (such as a copy machine operator, mail clerk, office helper, or warehouse checker). (*PageID##* 125-26). When cross-examined by McGrew's counsel, the VE testified that – as to the jobs at the medium level – if the hypothetical worker was further restricted to only occasional stooping, crouching, kneeling, crawling, and a sit/stand option, all 40,000 jobs would be eliminated. (*PageID#* 127). As to the availability of jobs at the light or even sedentary level, the VE testified that, in her "vocational opinion," if the hypothetical worker could not keep up with the pace of the jobs – even though limited to one- to two-step tasks and no fast paced production quotas – there would be no jobs available for such an individual. (*Id.*).

### C. Relevant Medical Opinions[5]

1. Darshan Sehbi, M.D.

When first assessed by Dr. Darshan Sehbi on April 30, 2008, McGrew reported that he had been under stress since returning from duty in Somalia. (*PageID#* 594). He spent four months in Somalia where he started as a gunner on a humvee and then later

---

[5] The parties have provided extensive descriptions of McGrew's medical records supported with many specific citations to evidence of record. (Doc. #8, *PageID##* 1012-1021; Doc. #12, *PageID#* 1044 (citing *PageID##* 68-80)). Because it is unnecessary to expand upon the parties' factual descriptions, the recitation of facts contained herein is limited to a summary of the relevant medical opinions.

drove trucks.  He related seeing American soldiers captured, killed, and their bodies dragged.  He complained of flashbacks of those memories.  He kept a gun in a closet at home and a baseball bat with him at night.  He mostly stayed at home.  He was becoming increasingly more depressed and had suicidal ideation.  (*PageID*# 596).  He was described as moderately anxious and agitated.  His affect was constricted.  He had fair insight and judgment.  Dr. Sehbi diagnosed PTSD and mood disorder due to general medical condition, which was chronic back pain.  Dr. Sehbi assigned McGrew a GAF score of 50.[6]  (*Id.*).  Dr. Sehbi prescribed Sertraline (Zoloft) and referred him to a counselor.  (*Id.*).

      2.    <u>Simran K. Sehbi, M.D.</u>

McGrew underwent a Compensation and Pension Examination in January 2009 by Simran K. Sehbi, M.D.  (*PageID* 577-85).  McGrew reported that since he returned from Somalia he has had intrusive thoughts about his traumatic combat experiences and about other incidents of death.  He reported frequent nightmares.  (*PageID*# 578).  He identified the most traumatic experience in Somalia:

> The worst was after a blackhawk [helicopter] was shot down and once the battle was done [a] few of [t]he [Army] rangers, who had been captured and killed, were dragged through the city. [McGrew] was on ground duty when the dead rangers were brought back with body parts severed and missing. [McGrew], and some of

---

[6]GAF," Global Assessment Functioning, is a tool used by health-care professionals to assess a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness.  It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation.  *See Martin v. Comm'r of Soc. Sec.*, 61 Fed.Appx. 191, 194 n.2 (6th Cir. 2003); *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision ("DSM-IV-TR") at 32-34.  A GAF of 45-50 indicates "severe symptoms ... or  serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)...."  *Id.*

his fellow soldiers, was ordered to reclaim one of the dead American soldier's body from one truck and load it onto another truck. The body was nude and his private parts had been mutilated.

(*PageID#* 581). McGrew also further discussed another traumatic event in which he witnessed a little Somalian girl get accidentally run over and killed by the trailer of an Army truck. He stated he saw "her head . . . smashed . . . and blood splattered everywhere." (*Id.*).

McGrew reported that he avoids contact "with people in general and mostly stays at home. He states his concentration is not good and his short term memory is less than desirable. He tends to forget what he was talking about." (*PageID#* 579). He reported that over the past 2-3 years his depression has been worsening, along with a decrease in energy and low motivation. McGrew stated that his depression is worse since his back injury. He reported other depressive symptoms, apart from a depressed mood, including poor motivation, low energy level, and not leaving his house. (*Id.*). He has had periods of anxiety, agitation, and restlessness to the extent that he sometimes felt "dizzy." McGrew also reported that he started having panic attacks in the past 2 years. (*Id.*). He did not seek treatment for his psychological issues for some time because he believed he was "strong." He eventually sought treatment because he recognized it was getting worse and was afraid he would lose his family. (*PageID#* 580). His wife stated that his personality had changed since his time in Somalia. (*PageID#* 582). She also noted that not being able to work was hard on him as he had always been very active. She noted that his symptoms were worsening and he could not handle any stress. (*Id.*). On the

8

mental status examination, he was somewhat anxious with some psychomotor agitation. (*PageID#* 583).  McGrew's affect was increased in intensity and reduced in rage; his mood was dysphoric and anxious; he had intrusive thoughts; and he had limitations in short term memory.  (*Id.*).  McGrew was diagnosed with PTSD, depressive disorder NOS, alcohol abuse by history and cannabis abuse in remission.  (*Id.*).  He was assigned a GAF score of 48, indicative of severe symptoms.  (*Id.*).  He met the criteria of PTSD.  Dr. Sehbi concluded that, "His depressive symptoms are considered to be multifactorial, ie secondary to deteriorating PTSD symptoms and their sequele, and exacerbation of his chronic pain."  (*PageID* 584).

When seen by Dr. Sehbi on July 22, 2009, McGrew reported he was getting more aggressive and irritable.  (*PageID#* 561).  Dr. Sehbi found the intensity of his affect was increased and his mood was dysphoric.  (*PageID#* 562).  Dr. Sehbi assigned McGrew a GAF score of 50.  She increased his dose of Sertraline and prescribed a trial of Zolpidem. (*PageID#* 563).

On May 17, 2010, McGrew reported that he had doubled his Sertraline.  He was becoming more depressed, irritable, and aggressive.  (*PageID#* 678).  On June 23, 2010, although McGrew reported doing a little better, he was continuing to experience PTSD symptoms and his sleep was still disturbed by nightmares.  His irritability was reported as less than before.  He has made some changes in the way he relates to his family members because, he stated, "I don't want to lose my family."  (*PageID#* 675).  His therapist at the Vet Center, Greg Merriweather, retired and since then he has not approached them for

9

another therapist. (*PageID# 676*). He reported two recent episodes of staph infection. He had stopped drinking a few weeks prior. (*Id.*). McGrew continued to treat with Dr. Sehbi. (*PageID## 809-57*).

On October 28, 2011, Dr. Sehbi opined that McGrew had chronic PTSD and a depressive disorder. He started treatment in 2009 and was seen in increasing frequency since then. Dr. Sehbi assigned a GAF score of 49. McGrew's symptoms included poor memory; appetite disturbance; sleep disturbance; personality change; mood disturbances; decreased energy; panic attacks; pervasive loss of interests; intrusive recollections of a traumatic experience; persistent irrational fears; paranoia or inappropriate suspiciousness; feelings of guilt/worthlessness; difficulty thinking or concentrating; generalized persistence anxiety, hostility and irritability; suicidal ideation; and emotional lability. (*PageID# 861*). According to Dr. Sehbi, McGrew's impairments had lasted or could be expected to last twelve months and exacerbated his physical symptoms. (*PageID# 863*). He would be absent more than three times a week. Dr. Sehbi concluded that McGrew was markedly restricted in his social functioning and have extreme deficiencies of concentration, persistence or pace. (*Id.*).

3.    Jerry E. Flexman, Ph.D.

Dr. Flexman performed a psychological examination of McGrew in March 2010, on behalf of the state agency. (*PageID## 633-37*). McGrew presented with PTSD from serving in the military in Somalia. He reported it was hard to sleep, he had bad dreams, and problems with his anger. He also reported depression due to pain; he is upset, angry

10

and withdrawn.  (*PageID#* 633).  McGrew reported to Dr. Flexman that he was able to independently handle his activities of daily living.  (*PageID#* 634).  He said he enjoyed going to movies and out to eat, but did not specify if, or how often, he could do such activities.  (*Id.*).

On mental status examination, McGrew's speech was within normal limits; his affect was appropriate and lability was not present.  He reported his mood was angry and tense.  (*PageID#* 635).  Dr. Flexman noted overt pain behavior with walking.  He was restless.  (*Id.*).  McGrew's attitude was solemn and he had feelings of helplessness. Eye contact was fair.  There were some PSTD symptoms and somatic preoccupations.  There was no suggestion of malingering.  Recent and remote memory was fair.  (*Id.*).

Dr. Flexman diagnosed a pain disorder, intermittent explosive disorder, PTSD, and alcohol abuse in partial remission.  He assigned McGrew a GAF score of 55, indicative of moderate symptoms.  (*PageID#* 636).  According to Dr. Flexman, McGrew was mildly impaired in his abilities to understand, remember and carry out short, simple instructions; make judgments for simple work-related decisions; and sustain attention and concentration.  (*Id.*).  Dr. Flexman found McGrew would have moderate difficulties responding appropriately to work pressures and work place changes; and interacting with supervisors. (*PageID#* 637).  Dr. Flexman concluded that McGrew had marked restrictions interacting with the public.  (*Id.*).

     4.    <u>David Dietz, Ph.D./Alice Chambly, Ph.D.</u>

Dr. Dietz, a state agency reviewing psychologist, indicated on April 6, 2010, that McGrew had a mild restriction in his daily activities, and moderate difficulties in his social functioning and in maintaining concentration, persistence, or pace. (*PageID# 649*). He was moderately restricted in his ability to do the following: work in coordination or proximity to others without being distracted by them; complete a normal workday or workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting. (*PageID## 653-54*). He was markedly impaired in his ability to deal with the public. (*PageID# 654*). Dr. Dietz concluded that McGrew would be capable of completing a wide variety of complex tasks that did not have strict production standards or schedules, or require more than superficial interaction with others. (*PageID# 655*). In September 2010, Dr. Chambly, a state agency reviewing psychologist, affirmed Dr. Dietz's assessment. (*PageID# 764*).

## III. **Administrative Review**

### A. **"Disability" Defined**

The Social Security Administration provides DIB to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 423(a)(1)(D). The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope. It encompasses only those who suffer from a medically determinable physical or mental impairment severe

enough to prevent them from engaging in substantial gainful activity.  *See* 42 U.S.C. § 423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70.  A DIB applicant bears the ultimate burden of establishing that he or she is under a "disability."  *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

### B.   Social Security Regulations

Administrative regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence.  *See PageID##* 68-70; *see also* 20 C.F.R. § 404.1520(a)(4).  Although a dispositive finding at any Step terminates the ALJ's review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), the complete sequential review answers five questions:

1.   Has the claimant engaged in substantial gainful activity?

2.   Does the claimant suffer from one or more severe impairments?

3.   Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the Listings), 20 C.F.R. Subpart P, Appendix 1?

4.   Considering the claimant's residual functional capacity, can he perform his past relevant work?

5.   Considering the claimant's age, education, past work experience, and residual functional capacity, can he or she perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

### C.   ALJ Withum's Decision

13

McGrew last met the insured status requirements of the Social Security Act through September 30, 2012.  (*PageID#* 70).

At Step 2 of the sequential evaluation, ALJ Withum concluded that McGrew has the severe impairments of degenerative disc disease, obesity, post-traumatic stress disorder, and depression.  (*Id.*).

The ALJ concluded at Step 3 that McGrew did not have an impairment or combination of impairments that met or equaled one of the Listings, including sections 1.04, 12.04, and 12.06.  (*PageID##* 70-71).

At Step 4, the ALJ evaluated McGrew's residual functional capacity ("RFC") and found that McGrew could perform medium work except he can never climb ladders, ropes or scaffolds, and must avoid all exposure to unprotected heights.  In light of his mental impairments, the ALJ also limited McGrew to low stress jobs with only occasional decision making and only occasional changes in work setting; 1- or 2-step tasks in an environment free of fast paced production requirements; no interaction with the public; and only occasional interaction with coworkers or supervisors.  (*PageID#* 72).

The ALJ concluded at Step 4 that McGrew was unable to perform any past relevant work.  (*PageID#* 78).

At Step 5, based on the testimony of the VE, the ALJ concluded that – considering McGrew's age, education, work experience, and RFC – he is capable of performing as many as 40,000 jobs at the unskilled medium occupational base in the regional area, including such jobs as order filler, hand packager, and store laborer.  (*PageID#* 79).

The ALJ's findings throughout her sequential evaluation led her to ultimately conclude that McGrew was not under a disability at any time from November 17, 2006, through the date of the ALJ's decision.  (*PageID#* 80).

## IV.  <u>Judicial Review</u>

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings.  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . ." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry, reviewing for correctness the ALJ's legal criteria, may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d

15

647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746.  "[E]ven if supported by substantial

evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to

follow its own regulations and where that error prejudices a claimant on the merits or

deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part

*Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541,

546-47 (6th Cir. 2004)).

## V.    Discussion

McGrew contends that the ALJ erred, in part, by failing to properly weigh the

opinion of his treating psychiatrist, Dr. Simran Sehbi.  (Doc. #8, *PageID##* 1022-28).

Resolving the parties' contentions begins with the standards used by ALJs to

weigh the various medical source opinions in the administrative record.  The Sixth Circuit

has held that claimants are "entitled to receive good reasons for the weight accorded their

treating sources independent of their substantive right to receive disability benefits."

*Smith v. Commissioner*, 482 F.3d 873, 875–76 (6th Cir. 2007); *see Cole v. Astrue*, 661

F.3d 931, 937–38 (6th Cir. 2011); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir.

2004).  "[T]he procedural requirement exists, in part, for claimants to understand why the

administrative bureaucracy deems them not disabled when physicians are telling them

that they are." *Smith*, 482 F.3d at 876; *see Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365

(6th Cir. 2013).

Generally, "the opinions of treating physicians are entitled to controlling weight."

*Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007), citing *Walters v.*

*Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997).  However, "'[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record.'" *Blakley*, 582 F.3d at 406, *quoting,* Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *2 (July 2, 1996).  The Sixth Circuit has noted that a treating physician's opinion can be discounted if: (1) it is not supported by medically acceptable clinical and laboratory diagnostic techniques; (2) it is inconsistent with substantial evidence in the record; (3) it does not identify the evidence supporting its finding; and (4) if it fares poorly when applying the factors listed in 20 C.F.R. § 404.1527(d)(2), which include, *inter alia*, the length and frequency of examinations, the amount of evidence used to support an opinion, the specialization of the physician, and consistency with the record.  *Wilson*, 378 F.3d at 546.

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity.  20 C.F.R. § 404.1527(e).  Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance.  20 C.F.R. § 404.1527(e); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

As to non-treating medical sources, the Regulations do not permit an ALJ to automatically accept or reject their opinions.  *See id*. at *2-*3.  The Regulations explain, "In deciding whether you are disabled, we will always consider the medical opinions in

17

your case record together with the rest of the relevant evidence we receive." 20 C.F.R. §
404.1527(b).  To fulfill this promise, the Regulations require ALJs to evaluate non-
treating medical source opinions under the factors set forth in § 404.1527(d) including, at
a minium, the factors of supportability, consistency, and specialization.  *See* 20 C.F.R. §
404.1572(f); *see also* Soc. Sec. Ruling 96-6p, 1996 WL 374180 at *2-*3.

McGrew argues that the ALJ failed to weigh Dr. Sehbi's opinion as required by
the Regulations.  (Doc. #8, *PageID#* 1023).  The Commissioner maintains that the ALJ
properly evaluated the medical source opinions of record and correctly found that Dr.
Sehbi's opinion could not be given full weight, because it was based on McGrew's
unsubstantiated reports and was inconsistent with the other substantial evidence of record.
(Doc. #12, *PageID#* 1047).

ALJ Withum rejected Dr. Sehbi's opinion, concluding Dr. Sehbi "apparently relied
quite heavily on the subjective report of symptoms and limitations provided by the
claimant, and seemed to uncritically accept as true most, if not all, of what the claimant
reported."  (*PageID#* 77).  The ALJ ultimately assigned Dr. Sehbi's opinion "limited
weight," finding the opinion consistent only "to the extent [it is] consistent with the above
residual functional capacity."  (*Id.*).

Problematic, however, is that the ALJ failed to provide a meaningful explanation
for declining to give Dr. Sehbi's opinion any substantive weight.  The pertinent
Regulation states, "the administrative law judge must explain in the decision the weight
given to the opinions of a State agency medical or psychological consultant or other

18

program physician or psychologist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us." 20 C.F.R. §404.1527(e)(2)(ii) (emphasis added).  A review of the VA treatment records reveals repeated diagnosis of depression and PTSD on many occasions and documents that McGrew's treatment consisted of medication (Sertraline) and counseling.  *See PageID##* 443, 459-60, 561-63, 569, 580, 583-85, 594-97, 676-78, 810-19, 837-38, 849-51, 856-57.  In this evidentiary situation, it was not enough for the ALJ to simply mention, in a conclusory manner, the "consistency" factor.  (*PageID#* 78). The ALJ therefore erred by failing to explain why she believed these records were inconsistent with the disability opinion of Dr. Sehbi.

Likewise, the moderate and mild GAF ratings in the VA records did not constitute substantial evidence in support of the ALJ's rejection of the disability opinion of Dr. Sehbi.  These GAF ratings are not explained in the VA records, (*see, e.g.*, *PageID##* 563, 583, 596, 810, 835, 849, 852, 857), and the ALJ did not rely on a medical source opinion to support her own lay conclusion regarding the meaning and significance of these GAF ratings.  *Cf. Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); *cf. also Rosa v. Callahan*, 168 F.3d 72, 78-79 (2nd Cir. 1999); *Hamlin v. Barnhart*, 365 F.3d 1208, 1217 (10th Cir. 2004).

Even assuming the ALJ's rejection of Dr. Sehbi's opinion was somehow proper, the ALJ nonetheless also erred by failing to properly weigh the opinions of Drs. Flexman, Dietz, and Chambly.

After rejecting Dr. Sehbi's opinion, the ALJ based her assessment of McGrew's RFC with a restriction to performing low-stress job duties (i.e., no direct dealing with the general public, no production quotas, and only occasional interaction with coworkers or supervisors) on the opinions of consultative psychologist, Dr. Flexman, and the opinions of state agency psychologists, Drs. Dietz and Chambly.   The ALJ explained:

> I give great weight to [...] Dr. Flexman, Dr. Dietz and Dr. Chambly's mental health assessment.  These State agency medical consultants' assessments are given great weight because not only did expert medical personnel render them, but also they are consistent with the other objective medical evidence of record and they are consistent with the claimant's alleged activities of daily living.  The State agency medical consultants are well versed in the assessment of functionality as it pertains to the disability provisions of the Social Security Act, as amended.

(*PageID*# 78).  Yet the ALJ was not permitted to automatically accept the opinions of the non-examining State agency reviewers.  Instead, the Regulations carefully delineate other factors pertinent to the ALJ's evaluation, reiterating three times the requirement that those factors apply to the evaluation of non-treating medical sources.  *See* 20 C.F.R. § 404.1527(d) ("we consider all of the following factors in deciding the weight to give any medical opinion . . ."); *see also* 20 C.F.R. § 404.1527(f)(ii) (factors apply to opinions of state agency consultants or other program physicians); 20 C.F.R. § 404.1527(f)(iii) (same as to medical experts' opinions); Social Sec. Ruling 96-6p, 1996 WL 374180 at *2 (same). The ALJ's decision provides no such analysis.  Instead, the ALJ appears to provide these opinions "great weight" because the doctors are "experts" and their opinions are consistent with "the other objective medical evidence of record" and

McGrew's daily activities.  (*PageID#* 78).  The ALJ, however, did not indicate what "other objective medical evidence" in the record is consistent with these opinions.  Such a failure also requires this case be remanded. *See Gayheart*, 710 F.3d at 379 ("[The ALJ's] failure to apply the same level of scrutiny to the opinions of the consultative doctors on which he relied, let alone the greater scrutiny of such sources called for by 20 C.F.R. § 404.1527, further demonstrates that his assessment of [the treating physician's] opinions failed to abide by the Commissioner's regulations and therefore calls into question the ALJ's analysis.")(internal citation omitted).

McGrew also contends the ALJ erred by not considering his disability determination from the Department of Veterans Affairs, particularly when considering his credibility.  Defendant argues "[t]he ALJ was not required to adopt the disability determination of the military, or any other governmental agency."  (Doc. #12, *PageID#* 1058).  Indeed, the Social Security regulations provide that the decision of another governmental agency is not binding on the Commissioner:

> A decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind s based on its rules and is not our decision about whether you are disabled or blind.  We must make a disability or blindness determination based on social security law.  Therefore, a determination made by another agency that you are disabled or blind is not binding on us.

20 C.F.R. § 404.1504.  Yet, the Sixth Circuit has held that while a disability rating from the Department of Veterans Affairs is not binding on the Commissioner, "the Commissioner may nonetheless find an agency's determinations relevant, depending on

21

the similarities between the rules and standards each agency applies to assess disability."
*LaRiccia v. Comm'r of Soc. Sec.*, 2013 Fed. App. 1027N (6th Cir. 2013). Accordingly, it
must at least be considered by the ALJ. *See Ritchie v. Comm'r of Soc. Sec.*, 540 Fed.
Appx. 508, 510 ("We have held that a disability rating from the Veterans Administration
is entitled to consideration, but we have not specified the weight such a determination
should carry when determining social security disability eligibility.")(citing *Stewart v.
Heckler*, 730 F.2d 1065, 1068 (6th Cir. 1984)).

Thus, regardless of whether a claimant's disability rating from the Department of
Veterans Affairs is ultimately determined relevant, the ALJ must consider the rating – and
*explain* such consideration – in the decision. Here, the ALJ failed to do so. Such an
omission is itself yet another ground for remand. *See, e.g., McCartey v. Massanari*, 298
F.3d 1072, 1076 (9th Cir. 2002) (finding ALJ's failure even to mention VA's disability
finding in his opinion constituted error and noting that "[n]o circuit has held that an ALJ
is free to disregard a VA disability rating."); *see also Rothgeb v. Astrue*, 3:08cv00115,
626 F. Supp. 2d 797, 809-10 (S.D. Ohio April 16, 2009)(Although not bound by
plaintiff's disability rating from Department of Veterans Affairs, ALJ "at least should
have considered the decision and articulated his reasons for rejecting it.") (Ovington,
M.J.), report and recommendations adopted without objections, 626 F. Supp. 2d 797
(May 6, 2009) (Rose, D.J.); *see also Lowery v. Comm'r of Soc. Sec.*, 886 F. Supp. 2d 700,
707 (S.D. Ohio Mar. 23, 2012)(Rice, D.J.) ("merely referencing the disability finding of

22

the Department of Veterans Affairs does not equate to an analysis of same or a consideration of the evidence presented to that administrative agency.").

For these reasons, McGrew's challenges to the ALJ's decision are well taken.

## VI.   <u>**Remand is Warranted**</u>

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits.  Under Sentence Four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding.  *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case, because the evidence of disability is not overwhelming, and because the evidence of a disability is not strong while contrary evidence is weak.  *See Faucher*, 17 F.3d at 176.

McGrew, however, is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of § 405(g), due to the problems identified above. On remand, the ALJ should be directed to: (1) re-evaluate the medical source opinions of record under the legal criteria set forth in the Commissioner's Regulations, Rulings, and as required by case law; (2) consider the disability decision of

the Department of Veterans Affairs; and (3) determine anew whether McGrew was under a disability and thus eligible for DIB during the period in question.

Accordingly, the case should be remanded to the Commissioner and the ALJ for further proceedings consistent with this Report and Recommendations.

### IT THEREFORE IS RECOMMENDED THAT:

1.  The Commissioner's non-disability finding be vacated;

2.  No finding be made as to whether Plaintiff James McGrew was under a "disability" within the meaning of the Social Security Act;

3.  This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. § 405(g) for further consideration consistent with this Report; and,

4.  The case be terminated on the docket of this Court.


April 8, 2014

       s/Sharon L. Ovington   
        Sharon L. Ovington
     Chief United States Magistrate Judge

24

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).